[No. B185904. Second Dist., Div. One. Feb. 27, 2006.]

RENE C., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

2

**4**

COUNSEL

Janice Y. Fukai, Alternate Public Defender, Felicia Kahn Grant and Frederick Lacey, Deputy Alternate Public Defenders, for Petitioner.

No appearance for Respondent.

Steve Cooley, District Attorney, Leal Rubin, Phyllis Asayama and Shirley S. N. Sun, Deputy District Attorneys, for Real Party in Interest.

OPINION

SPENCER, P. J.—

## INTRODUCTION

In this mandate proceeding, Rene C. seeks relief from the juvenile court's order declaring that he is not a fit and proper subject to be dealt with under the juvenile court law. We grant his writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 3, 2005, the People filed a petition pursuant to Welfare and Institutions Code section 602,[1] alleging that when Rene was 14 years of age he committed the crimes of murder (Pen. Code, § 187; count 1), attempted murder (id., §§ 187, 664; count 2) and assault with a firearm (id., § 245, subd. (a)(2); count 3). The People also alleged numerous firearm and great bodily injury enhancements. (Id., §§ 12022.53, subds. (b), (c), (d) (counts 1 & 2), 12022, subd. (a)(1) (count 1), 12022.7, subd. (a) (counts 2 & 3), 12022.5 (count 3).) Due to the nature of the offenses alleged, Rene statutorily was presumed not to be a fit and proper subject to be dealt with under the juvenile court law (§ 707, subds. (b)(1), (12) & (13), (c)). The People consequently moved the court for an order declaring Rene unfit so they could try him as an adult.

On May 24, 2005, the juvenile court conducted an *Edsel P.*[2] hearing, which was followed immediately by a fitness hearing. During the *Edsel P.* hearing, the following evidence was adduced:

---

[1] All statutory references hereinafter are to the Welfare and Institutions Code unless otherwise noted.

[2] When a minor charged with a crime triggering the presumption of unfitness challenges the sufficiency of the evidence establishing that he committed the alleged offenses, *Edsel P. v. Superior Court* (1985) 165 Cal.App.3d 763 [211 Cal.Rptr. 869] requires the People to make a prima facie showing that the minor committed the crimes before a fitness hearing may be held. The phrase " 'prima facie case' amounts to 'sufficient cause' within the meaning of Penal Code

Alex Santos (Alex), the murder victim in count 1, was a member of a tagging crew. Prior to January 14, 2004, someone from a rival tagging crew had threatened Alex with a gun. Alex told his older brother, George Santos (George), what had happened. George is the named victim in counts 2 and 3.

On January 14, 2004, George drove Alex and Alex's friends, Daniel Torrero (Torrero), Rudolfo Gonzalez (Gonzalez) and two others, to a market so they could buy something to drink. Alex and Torrero went inside the market while the others remained in George's truck, which was parked across the street. When Alex and Torrero walked out of the market, 12 or 13 members of the rival "DSW" tagging crew advanced on them. Sensing his brother was in danger, George got out of his truck and ran across the street. George punched one of the DSW crew members as hard as he could without warning in order to protect Alex. The individual fell to the ground, after which George repeatedly kicked the individual with all his might. This person assumed a fetal position in an attempt to protect himself. After the fourth or fifth kick, someone shot George. The person on the ground then stood up and ran away. At that point, George attempted to return to his truck. As he did so, he saw Alex approaching and realized for the first time that Alex had been shot in the neck. Alex later died of his injuries.

Bell Gardens Police Detective Angel Puente investigated the shooting. Torrero told the detective that when he walked out of the market, he saw a large group of DSW tagging crew members walking toward him and Alex. Fearful that a fight would ensue, Torrero ran away. As he fled, Torrero saw someone point a gun at Alex. Torrero continued to run but looked back when he heard two gunshots. Alex had been shot.

During a subsequent interview, Torrero gave Detective Puente additional details about the shooting. Torrero told Detective Puente that while he was running, he saw George fighting with someone on the ground. Torrero heard a gunshot and saw the person with whom George was fighting stand up and run away, holding something near his front pants pocket. Torrero selected Rene's picture out of a photographic display, identifying him as the person with whom George had been fighting. Torrero also identified Andrew S. as the person who shot Alex.[3] According to Detective Puente, both Rene and Andrew S. are members of the DSW tagging crew.

---

sections 871 and 872. 'That phrase is generally equivalent to "reasonable and probable cause" which has been defined as such a state of facts as would lead a man of ordinary caution and prudence to believe and conscientiously entertain a strong suspicion of the guilt of the accused. [Citations.]' [Citation.]" (*Edsel P.*, *supra*, at p. 780, fn. 10; accord, *Marcus W. v. Superior Court* (2002) 98 Cal.App.4th 36, 41 [118 Cal.Rptr.2d 919].)

[3] On the day of the shooting, Torrero told Detective Puente that he would be unable to identify the shooter, in that he did not see who fired the gun.

Gonzalez told Detective Puente that he was waiting in George's truck when he saw a large group of males from a rival tagging crew advancing on Alex and Torrero after they walked out of the market. At that point, Gonzalez, along with George, got out of the truck and approached the group. Gonzalez heard two gunshots and saw a male holding a revolver. Gonzalez saw Alex fall to the ground. The members of the group then dispersed. From a photographic display containing six pictures, Gonzalez identified Andrew S. as the person who shot Alex, and Rene as the person who shot George.

George told Detective Puente that he did not know who shot him and that the person with whom he fought did not shoot him and was not Rene. At the hearing, George testified that he did not recognize Rene and that Rene was not the person with whom he fought.[4]

Rene's attorney argued that Rene was acting in self-defense when he shot George. The court rejected the argument, stating, "there's no testimony that George Santos ever touched [Rene]. The only testimony that I have before me, and I mean this with all sincerity, is that he was identified by a witness to take a gun and shoot [George]." Rather than inform the court that it was mistaken and call the court's attention to Torrero's statement that Rene was the person with whom George was fighting on the ground and who got up off the ground and ran away holding something near the front of his pants after George was shot, Rene's attorney inexplicably agreed with the court's characterization of the evidence. The court concluded that the People had established a prima facie showing that Rene had committed the alleged offenses[5] and then turned to the issue of Rene's fitness to be tried as a juvenile.

Rene's counsel submitted on the report of Dr. Edward Fischer, a licensed psychologist appointed by the juvenile court to evaluate Rene pursuant to Evidence Code sections 730 and 952 with regard to his fitness for treatment under the juvenile court law.[6] Dr. Fischer reported that Rene lived with both parents and that his current detention was the first time he had ever been away from home.

---

[4] George was a defense witness.

[5] Rene does not challenge this finding in this writ proceeding.

[6] The statutory fitness criteria are as follows: "(1) The degree of criminal sophistication exhibited by the minor. [¶] (2) Whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction. [¶] (3) The minor's previous delinquent history. [¶] (4) Success of previous attempts by the juvenile court to rehabilitate the minor. [¶] (5) The circumstances and gravity of the offenses alleged in the petition to have been committed by the minor." (§ 707, subd. (c); accord, Cal. Rules of Court, rule 1483(c).)

According to Dr. Fischer, Rene has been a special education student his entire life. He "related in a childish, simpleminded, immature manner." Rene cried during the course of his interview with Dr. Fischer.

As part of his evaluation, Dr. Fischer administered various tests to Rene. Dr. Fischer concluded that Rene suffers from "congenital organic brain dysfunction." Dr. Fischer observed that Rene "has attended a Special Education Program in all subjects. His measured intelligence and his achievement test scores are consistent with a diagnosis of Mild Mental Retardation, and it appears that the defendant is a Developmentally Disabled person within the meaning of" the Welfare and Institutions Code.

Dr. Fischer opined that Rene was fit with respect to all five fitness criteria set forth in section 707, subdivision (c). With regard to the fifth and final factor, the circumstances and gravity of the offenses allegedly committed by Rene, Dr. Fischer made the following observations:

"While the allegations against the minor are quite serious, his role was passive,[7] without a personal motive, and the result of his association with the minor who placed the gun in his hand and told him to show it to their enemies.

"His responsibility is diminished by the fact of his mental retardation and immaturity. This fourteen-year-old experiences life in the credulous manner of an eight year old. He was punched and then kicked by a twenty-five-year-old adult that [sic] he believes assaulted him years earlier when he lived in Maywood. This . . . fourteen-year-old was unable to show his attacker the gun he [had] been given to frighten him away and he was certain that he would be soundly beaten and seriously injured, if not killed. He panicked and shot his attacker George Santos. He is also charged with the death of Alex Santos, his victim's younger brother.

"At the time of the offense, the minor was unable to appreciate any alternative course of action. At the time of the evaluation, he conceded that he knows that he is not justified in the use of deadly force in response to an unarmed assault, but he was afraid.

"In summary, the minor remains fit for rehabilitation in the juvenile justice system because of his immaturity and his developmental disability. An

---

[7] The psychological definition of "passive" obviously differs from the criminal definition. Dr. Fischer observed that "[m]inors who suffer from mental retardation are frequently assigned the role of driving the car or holding the gun in crimes that they would otherwise lack the ability or inclination to plan and execute." Thus, a "passive" participant seemingly refers to one who is a follower, rather than a leader or instigator.

appropriate disposition is referral to the [R]egional Center for a suitable placement [where] this developmentally disabled minor can undergo . . . assessment and rehabilitation. It is quite possible with appropriate supervision that this minor would never again offend."

When submitting on Dr. Fischer's report, Rene's counsel emphasized the following: "Rene, at the time of this offense, was 14 years and 2 months. He comes from loving parents, who have been in continuous contact with me showing their concern for their son. [¶] One of the more important aspects of Dr. Fischer's report is the testing of Rene and Dr. Fischer's determination . . . that he functions as an 8-year-old based on his borderline mental retardation." Counsel questioned whether the adult system was the right system for Rene despite the crimes he is alleged to have committed. Counsel urged the court to keep Rene in the juvenile system and emphasized that the "only chance of saving this young man's life is to keep him here in juvenile court."

After entertaining the arguments of all counsel, the juvenile court found Rene fit under the first four criteria, but unfit as to the fifth and final criterion. The court ruled as follows: "In regard to the minor Rene [C.], in regard to the first factor, for the degree of criminal sophistication, I find the minor fit for juvenile court. [¶] On the second factor whether the minor can be rehabilitated prior to the expiration of juvenile court's jurisdiction, I find that the minor is fit. [¶] On the third factor, the minor's previous juvenile history, he has no prior record. Therefore, I find that he is fit. [¶] On the fourth factor, previous attempts for juvenile rehabilitation, there were no attempts. Find the minor fit. [¶] The fifth factor, circumstances and gravity of the offense[s] alleged to have been committed by the minor, I find the minor unfit. [¶] The minor fired a gun to cause harm and possibly death to victims. The minor's motivation was gang related and he played a primary role in the commission of the crime. Minor chose to engage in delinquent behavior and posed a serious threat to the safety not only to the people injured, but also to other people who were in the community. [¶] Therefore, the court finds minor, Rene C[.], is not a fit and proper subject for consideration under the provisions of [the] Juvenile Court . . . law; the court directs the prosecution to file an accusatory pleading against the minor in a court of criminal jurisdiction. . . ." The People thereafter filed a felony complaint against Rene on May 26, 2005, charging him with murder, attempted murder and assault with a firearm, and alleging various firearm and great bodily injury enhancements.

## CONTENTIONS

Rene contends the juvenile court abused its discretion by failing to consider his psychological evaluation when making its fitness determination. Rene further contends he met his burden of rebutting the presumption of

unfitness. Although we conclude that the juvenile court considered Rene's psychological evaluation when making its fitness determination, we do agree that Rene rebutted the presumption of unfitness.

## DISCUSSION

### I. *Rene's Writ Petition Was Timely*

Before we can reach the merits of Rene's contentions, we must address the People's assertion that Rene's writ petition should be denied because it is untimely. Rule 1483(j) of the California Rules of Court provides: "An order that a child is or is not a fit and proper subject to be dealt with under the juvenile court law is not an appealable order. Appellate review of the order is by extraordinary writ. Any petition for review of a judge's order determining the child unfit . . . shall be filed no later than 20 days after the child's first arraignment on an accusatory pleading based on the allegations that led to the unfitness determination."

The People's first accusatory pleading based on the allegations that led to the unfitness determination was the felony complaint, which was filed on May 26, 2005. On that same date, the court called the case for arraignment. Rene demanded counsel, and the court appointed the alternate public defender to represent him. Rene waived arraignment, reading of the complaint and statement of rights, after which the court continued the matter to June 9, 2005, for arraignment and plea. The court subsequently continued the matter three more times to September 1, 2005, when Rene entered a plea of not guilty to all counts.

The People contend that Rene had 20 days from May 26, 2005, or until June 15, 2005, to file his writ petition challenging the juvenile court's finding of unfitness. Rene, on the other hand, contends he had 20 days from September 1, 2005, or until September 21, to file his writ petition. Rene is correct.

An "arraignment . . . consists in reading the accusatory pleading to the defendant and delivering to the defendant a true copy thereof, and of the endorsements thereon, if any, including the list of witnesses, *and asking the defendant whether the defendant pleads guilty or not guilty to the accusatory pleading . . . .*" (Pen. Code, § 988, italics added.) Inasmuch as Rene was not asked to enter a plea until September 1, 2005, he technically was not arraigned on the felony complaint until September 1. He thereafter had 20 days to seek extraordinary relief. His writ petition filed on September 21, 2005, therefore, was timely.

## II. *Applicable Law and Standard of Review*

■ A minor who is 14 years of age or older at the time he commits a serious crime enumerated in section 707, subdivision (b), is presumed not to be a fit subject to be dealt with under the juvenile court law. (§ 707, subd. (c); *Manduley v. Superior Court* (2002) 27 Cal.4th 537, 548 [117 Cal.Rptr.2d 168, 41 P.3d 3].) Among the crimes listed in section 707, subdivision (b), are murder (*id.*, subd. (b)(1)), attempted murder (*id.*, subd. (b)(12)), and assault with a firearm (*id.*, subd. (b)(13)), the crimes alleged against Rene in the section 602 petition.

■ At a fitness hearing, the minor who is presumed to be unfit has the burden of rebutting the presumption by a preponderance of the evidence. (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681 [76 Cal.Rptr.2d 641, 958 P.2d 393]; *People v. Superior Court (Zaharias M.)* (1993) 21 Cal.App.4th 302, 306–308 [25 Cal.Rptr.2d 838]; Cal. Rules of Court, rule 1483(a).) The minor is not required to demonstrate he is innocent in order to establish his amenability to treatment under the juvenile court law. (*People v. Superior Court (Jones)*, *supra*, at p. 682.) In fact, guilt or innocence is irrelevant at a fitness hearing. (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716 [135 Cal.Rptr. 392, 557 P.2d 976], disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 33–34 [164 Cal.Rptr. 1, 609 P.2d 468]; *People v. Superior Court (Rodrigo O.)* (1994) 22 Cal.App.4th 1297, 1303 [27 Cal.Rptr.2d 796].) The factors used to assess fitness presuppose that the minor committed the offense. (*People v. Superior Court (Jones)*, *supra*, at p. 682; *People v. Superior Court (Rodrigo O.)*, *supra*, at pp. 1303–1304). At the fitness hearing, the only question to be adjudicated is "whether the best interests of the minor and society would be served by retention of juvenile court authority." (*People v. Superior Court (Zaharias M.)*, *supra*, at p. 307.)

■ The juvenile court considers five factors when assessing a minor's fitness for treatment under the juvenile court law. Specifically, the court considers the minor's degree of criminal sophistication, the minor's ability to be rehabilitated before the juvenile court's jurisdiction expires, the minor's prior delinquent history, the success of prior attempts to rehabilitate the minor and the circumstances and gravity of the crimes alleged against the minor. (§ 707, subd. (c); *Manduley v. Superior Court*, *supra*, 27 Cal.4th at p. 548; *Marcus W. v. Superior Court*, *supra*, 98 Cal.App.4th at p. 40.)

The juvenile court's determination that a minor is fit to be dealt with as a juvenile "shall be based on a finding of amenability after consideration" of all five criteria "and findings therefor recited in the order as to each . . . criteria that the minor is fit and proper under each and every one of the . . . criteria.

In making a finding of fitness, the court may consider extenuating or mitigating circumstances in evaluating each of the [five] criteria." (§ 707, subd. (c).)

■ Following receipt of the probation officer's report[8] and other relevant evidence, the juvenile court must find the minor unfit unless it concludes "based upon evidence, which evidence may be of extenuating or mitigating circumstances, that the minor would be amenable to the care, treatment, and training program available through the facilities of the juvenile court . . . ." (§ 707, subd. (c); accord, Cal. Rules of Court, rule 1483(c).)

To rebut the presumption of unfitness the minor "may use the information contained in police reports, the probation report, expert evaluations, and other submissions to the court 'to argue that his participation was not as grave or serious as the charge would initially lead a court to conclude.' [Citation.]" (*People v. Superior Court (Jones)*, *supra*, 18 Cal.4th at p. 682.)

The juvenile court's determination as to whether a particular minor is fit or unfit for treatment under juvenile court law is reviewed under the abuse of discretion standard. (*People v. Chi Ko Wong*, *supra*, 18 Cal.3d at p. 718; *Marcus W. v. Superior Court*, *supra*, 98 Cal.App.4th at p. 42.) We treat the court's ruling on the fitness criteria as factual findings, which we uphold if substantial evidence supports them. (*People v. Superior Court (Jones)*, *supra*, 18 Cal.4th at pp. 680, 681, fn. 3; *Marcus W.*, *supra*, at p. 42.)

III. *The Court Did Not Ignore the Psychologist's Evaluation*

We reject Rene's contention that the juvenile court abused its discretion by failing to consider Dr. Fischer's report when making its fitness determination. Rene's counsel expressly referred to Dr. Fischer's report in his arguments to the court and highlighted certain portions of the report when urging the court to find Rene fit to be dealt with under the juvenile court law. Although the court did not mention Dr. Fischer's report when announcing its findings, we presume, as we must, that the court read and considered Dr. Fischer's report (Evid. Code, § 664) but conclude that it did not consider the contents of the report sufficiently mitigating to justify a finding of fitness on the fifth criterion, the circumstances and gravity of the offenses.

IV. *The Court Misstated the Facts and Overlooked Critical Evidence*

In making its fitness determination, the court had before it the evidence adduced at the *Edsel P.* hearing and Dr. Fischer's psychological evaluation of

---

[8] The probation officer's report is not part of the record before us.

Rene. During the *Edsel P.* hearing, the court rejected Rene's claim of self-defense, stating that there was no evidence that George touched Rene, only evidence that Rene shot George. The court was wrong, in that there was evidence that Rene was the person George struck and kicked.

It is undisputed that George struck a DSW tagging crew member, knocking him to the ground, and then kicked him repeatedly. Although George testified that Rene was not the person with whom he fought, there most definitely was evidence to the contrary. Torrero informed Detective Puente that George was fighting with Rene and that, after a gunshot, Rene got up off the ground and ran away while holding something near the front of his pants. Thus, contrary to the court's belief, there was evidence at the *Edsel P.* hearing that George had touched Rene. The court's statement to the contrary establishes that the court misstated the facts and overlooked critical evidence from which it reasonably could have inferred that George was kicking Rene when Rene shot him. Undoubtedly, the court's oversight carried over to its fitness determination.

Whether the court would have found that George had attacked Rene, if it had not overlooked Torrero's statement, or whether it nevertheless would have accepted George's statement that Rene was not the person with whom he fought is a question about which we do not speculate. Suffice it to say that, as the People conceded at oral argument, the evidence only supports two possible factual scenarios. Either George was kicking Rene when Rene shot George *or* George was kicking another DSW tagging crew member when Rene shot George. As we now explain, under either scenario, the court abused its discretion in finding Rene unfit to be dealt with under the juvenile court law.

V. *Rene Rebutted the Presumption of Unfitness*

■ In order to rebut the presumption of unfitness under the circumstances and gravity of the crimes criterion, the evidence must demonstrate that the minor's participation was less grave or less serious than the crime would lead a court to believe. When evaluating the circumstances and gravity of the crime, the court may consider any evidence pertaining to the minor's mental state that tends to lessen the severity of the crime even if such evidence does not justify or excuse the crime. (*People v. Superior Court (Jones), supra,* 18 Cal.4th at p. 685.)

■ In this case, to rebut the presumption of fitness, Rene relied upon Dr. Fischer's expert evaluation to argue that his participation in the crimes was not as grave or serious as the charges might lead a court to believe. (*People v. Superior Court (Jones), supra,* 18 Cal.4th at p. 682.) This

evaluation reveals that Rene is a young boy with no juvenile or criminal history. He lives with both parents and his "present detention is the first time that he has ever been away from home." He is developmentally disabled, mentally retarded and suffers from organic brain dysfunction. In Dr. Fischer's opinion, Rene's responsibility for the crimes is diminished due to his mental retardation and immaturity.

Dr. Fischer observed that "[m]inors who suffer from mental retardation are frequently assigned the role of . . . holding the gun in crimes that they would otherwise lack the ability or inclination to plan and execute." In light of Rene's mental retardation, Dr. Fischer opined that Rene's role in the shooting was a passive one. Dr. Fischer's statement that Rene experiences life "in the credulous manner of an eight year old" suggests that Rene related to his fellow tagging crew members as would an eight year old and reacted to what he experienced as would an eight year old. Surely, these are extenuating and mitigating factors that compel the conclusion that this mentally retarded and immature 14-year-old boy with no prior juvenile or criminal history should be tried as a juvenile, not an adult.

The juvenile court found that Rene was unfit for juvenile court treatment because he was a gang member who carried a gun to a confrontation and then shot someone. The court thus focused on Rene's affiliation and deeds without giving proper weight to his mental limitations and viewed him as being more actively involved in the shooting than his mental limitations actually permitted.

We also observe, with respect to the charge of murder, that there is no evidence whatsoever that Rene shot Alex. Rather, the undisputed evidence reveals that Andrew S. shot and killed Alex. While this fact may not insulate Rene from liability for Alex's death as an aider and abettor, it highlights that Rene only fired his gun to ward off his adult attacker or to help a companion who was being attacked by George.

For the reasons stated *ante*, we conclude that Rene rebutted the presumption of unfitness. In light of his organic brain dysfunction, mental retardation and immaturity, Rene's participation in the events, which prompted the filing of the section 602 petition, undoubtedly was less grave or less serious than the crimes would lead a court to believe and thus establishes his fitness under the fifth criterion. (*People v. Superior Court (Jones)*, *supra*, 18 Cal.4th at p. 685.) Inasmuch as the juvenile court abused its discretion in finding Rene an unfit

subject to be dealt with under the juvenile court law under this particular criterion,[9] writ relief is required.

## DISPOSITION

Let a peremptory writ of mandate issue commanding the Los Angeles Superior Court, Juvenile Division, to vacate its order of May 24, 2005 in *People v. Rene C.*, Los Angeles Superior Court Case No. VJ30328, finding that petitioner Rene C. is not a fit and proper subject to be dealt with under the juvenile court law and to issue a new and different order finding that he is fit.

Vogel, J., and Mallano, J., concurred.

---

[9] We do not reach the merits of the People's argument that the will of the electorate, as evidenced by its passage during the March 7, 2000 Primary Election of the Gang Violence and Juvenile Crime Prevention Act of 1998 (Proposition 21), requires a finding of unfitness in this case, in that the People did not allege a criminal street gang enhancement against Rene in the section 602 petition.